In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-2705

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

FRANK D. MCGRAW,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Indiana, Fort Wayne Division.
No. 06 CR 28—**Theresa L. Springmann**, *Judge.*

ARGUED JANUARY 9, 2009—DECIDED JULY 2, 2009

Before MANION, ROVNER, and SYKES, *Circuit Judges*.

SYKES, *Circuit Judge.* While executing a search warrant for drugs inside a Fort Wayne, Indiana apartment building, police officers noticed that the building had several housing-code violations. Police called a neighborhood code-enforcement officer, who arrived and determined that the apartment building must be condemned. That determination required officers to go door-to-door and notify the building's residents that they needed to leave their apartments. When Frank McGraw, the second-

floor tenant, arrived on the scene, officers instructed him to secure his dog and collect the belongings he would need for a few days. They also explained their need to inspect his apartment for housing-code violations and to search for potential stragglers. McGraw consented to the search three times before leaving the apartment building with his dog. During that search, police observed narcotics in plain view, and McGraw was charged with possession of crack cocaine.

McGraw moved to suppress the evidence, claiming that any consent he gave was not voluntary but instead constituted acquiescence to the officers' display of authority. The district court denied the motion, finding that McGraw's consent was voluntary. McGraw then entered into a conditional plea agreement, in which he waived his right to appeal sentencing determinations but preserved his right to appeal the court's suppression ruling. At sentencing the district court classified McGraw as a career offender under the guidelines and sentenced him to 262 months' imprisonment. On appeal McGraw challenges the court's suppression ruling and its determination that he qualified as a career offender.

We affirm. The district court did not clearly err in finding that McGraw voluntarily consented to the officers' search. The court analyzed the totality of the circumstances and determined that despite the way in which some of the officers phrased their request to search McGraw's unit, McGraw voluntarily consented to their search. Because the court's conclusion is entirely plausible in light of the record viewed in its entirety, the

court properly denied McGraw's motion to suppress. Further, we hold that McGraw waived his right to challenge the district court's sentencing determination.

## I. Background

## A. Officers Search McGraw's Apartment[1]

On April 6, 2006, Officer Squadrito, Officer Musi, and other officers executed a search warrant for drugs in the third-floor unit of an apartment building in Fort Wayne, Indiana. In the process of searching the apartment and arresting its inhabitants, officers noticed several housing-code violations. They contacted Mark Salomon, a neighborhood code-enforcement officer, who arrived and determined that the building must be condemned because, among other violations, it lacked a working furnace. Because this decision required the officers to board up the building until the landlord made the necessary repairs, the officers first had to notify the residents of the condemnation and ensure that everybody vacated the building. Frank McGraw, the second-floor tenant, was absent, but officers could hear a large dog barking behind his door. Officers soon learned that McGraw was across the street, and they summoned him to his apartment. By the time McGraw arrived, Salomon had

---

[1] The historical facts concerning the search are taken from the district court's opinion denying McGraw's motion to suppress. McGraw does not challenge these findings of fact on appeal.

attached a "condemned sign" to the front of the building. A crowd of bystanders had also gathered, and a S.W.A.T. team from the third-floor raid stood by.

Salomon and Musi greeted McGraw on the building's front porch. McGraw asked what his apartment had to do with the third-floor search, and Salomon answered that the entire building had been condemned. Salomon twice explained to McGraw that officers "would need to go into his apartment to do a[n] inspection inside of his apartment to look for other housing code violations." Salomon also told McGraw that the dog prevented the officers from conducting this inspection. Salomon thus offered McGraw the choice to retrieve his dog or have Animal Control do it for him. McGraw chose the former and commented that his "dog did not like people in uniform," a statement the district court interpreted as a joke. As McGraw approached the building's entrance, Squadrito told him "to retrieve his dog and his belongings, because it was going to be a day or two" before McGraw could reenter the condemned building. McGraw responded that officers were "welcome to go up there with him" and reiterated that his dog, a "pit bull[,] doesn't like police officers." Inside the building but outside his apartment, McGraw then spoke with Musi, who asked, "Sir, do you mind if we go in with you to make sure there's nobody else in there?" McGraw responded, "Go ahead if you want to search," or "Yeah, go ahead and come in and search if you want to." Squadrito, however, told his fellow officers to stay outside because the pit bull threatened their safety.

McGraw entered his apartment, and a few minutes passed while he searched for his dog's leash. Because of the delay, police told McGraw to leave his apartment. McGraw quickly leashed his dog with his cell-phone cord and exited the apartment, leaving his door ajar and his lights and television on. Once outside the building, McGraw again briefly spoke with Squadrito, who told McGraw that police "were going to check his apartment." McGraw responded that his door was open and that they were "more than welcome" to enter but that nobody remained inside. Squadrito explained that police would nonetheless have to make sure before they boarded up the building. McGraw then left the premises with his dog.

Squadrito entered McGraw's apartment to search for stragglers, while Salomon searched the unit for other housing-code violations. In McGraw's bedroom Squadrito saw in plain view a digital scale with a white residue, a plastic bag containing a green weed-like substance, and an open gym bag containing money and suspected crack cocaine. Squadrito had Salomon photograph the suspected narcotics, and they quickly exited the apartment. Police later obtained a search warrant and recovered the evidence.

## B. The Proceedings Below

McGraw was charged with possession with intent to distribute crack cocaine in violation of 21 U.S.C. § 841(a)(1). He moved to suppress the evidence obtained in the search of his apartment. The district court concluded that the officers had performed a warrantless search without

exigent circumstances and that suppression therefore turned on whether McGraw had voluntarily consented to the search. The court held that "a totality of the circumstances shows that the Defendant voluntarily gave permission to the officers." The court found that McGraw consented first to Squadrito's request to search and then to Musi's before entering his apartment to retrieve his dog, but that the scope of those consents was limited to a search with McGraw present. The court further held that McGraw extended the scope of his consent to encompass a search outside of his presence when, as he exited the building with his dog, he told Squadrito that officers were "more than welcome" to search his apartment.

The court rejected McGraw's argument that any consent he gave was merely acquiescence to the officers' display of authority and therefore not voluntary. The court believed that the facts "present a close case" but nonetheless concluded that the officers did not claim authority to search and that any consent was voluntarily given. As the court explained,

> This finding rests primarily on the facts that [McGraw] was not a suspect and had no reason to think that he was a suspect, that [McGraw] gave consent to the officers to come with him into his apartment twice, that [McGraw] invited them in a third time as he was leaving, and that the interactions between [McGraw] and the officers had been calm and cooperative.

The district court also considered the officers' comments. It construed Salomon's statement of a "need to go inside"

to inspect the apartment as a request rather than a command because it had no coercive effect and did not imply that Salomon suspected McGraw of wrongdoing. The court interpreted Squadrito's statement that police "were going to check his apartment" as a "follow-up" to McGraw's first invitation into his apartment or, alternatively, as a suggestion of authority based only on McGraw's previous consents. The court also highlighted that Musi's question whether officers could enter McGraw's apartment implied that permission could be refused, yet McGraw nevertheless welcomed officers into his apartment. Finally, the court noted that "the total lack of any statement by [McGraw] implying that he objected to the officers' search of his apartment also suggests he voluntarily consented to the search of his apartment."

Having lost the suppression battle, McGraw entered a conditional plea of guilty, waived his right to challenge any aspect of his sentencing, and preserved his right to challenge the district court's denial of his motion to suppress. At sentencing the district court classified McGraw as a career offender under § 4B1.1 of the *United States Sentencing Guidelines* and sentenced him to 262 months, the low end of the applicable guidelines range.

## II. Analysis

This case presents two issues on appeal: first, whether the district court clearly erred in determining that McGraw voluntarily consented to the search of his apartment, and second, whether McGraw may challenge the

district court's classification of McGraw as a career of-fender. Because we conclude that the district court did not clearly err in its suppression ruling and that McGraw waived his right to challenge his sentencing, we affirm.

## A.  The District Court's Suppression Ruling

The Fourth and Fourteenth Amendments safeguard the "right of the people to be secure in their . . . houses . . . against unreasonable searches and seizures." A warrantless search of a suspect's house without exigent circumstances is presumptively unreasonable, *Payton v. New York*, 445 U.S. 573 (1980), and the exclusionary rule generally requires suppression of the evidence obtained from such searches. However, this general rule is subject to well-recognized exceptions, including the suspect's voluntary consent to the search.[2] *See, e.g., Schneckloth v. Bustamonte*, 412 U.S. 218 (1973). Consent-search cases distinguish between voluntary consent and consent resulting from duress, coercion, or acquiescence to authority. This is a "question of fact to be determined from the totality of all the circumstances," *id.* at 227, and the government

---

[2] We presume for purposes of this appeal that the search was constitutional only if McGraw voluntarily consented to the officers' entry. The government has not disputed the district court's finding that no exigent circumstances justified this warrantless search, nor has the government suggested that the special-needs or administrative-search doctrines are relevant.

bears the burden of proving voluntary consent by a preponderance of the evidence, *United States v. Basinski*, 226 F.3d 829, 833 (7th Cir. 2000). Factors bearing on this inquiry include:

> (1) the person's age, intelligence, and education, (2) whether he was advised of his constitutional rights, (3) how long he was detained before he gave his consent, (4) whether his consent was immediate, or was prompted by repeated requests by the authorities, (5) whether any physical coercion was used, and (6) whether the individual was in police custody when he gave his consent.

*United States v. Raibley*, 243 F.3d 1069, 1075-76 (7th Cir. 2001); *see also Schneckloth*, 412 U.S. at 226 (listing essentially the same factors).

In this case the district court concluded that the government satisfied its burden of proving voluntary consent. The parties agree that we review that determination for clear error. *See Raibley*, 243 F.3d at 1076; *United States v. Nafzger*, 965 F.2d 213, 216 (7th Cir. 1992). "A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. Rice*, 995 F.2d 719, 722 (7th Cir. 1993). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 574 (1985). Stated differently, " '[i]f the district court's account of the facts is plausible in light of the record viewed in its entirety, we

may not reverse that decision even if we may have decided the case differently.'" *Raibley*, 243 F.3d at 1076 (quoting *Cent. States, Se. & Sw. Areas Pension Fund v. Kroger Co.*, 226 F.3d 903, 910 (7th Cir. 2000)).

We agree with the district court that this is a close case. On the one hand, considerable evidence suggested that McGraw voluntarily consented to the officers' search. For instance, Musi specifically requested the right to enter McGraw's apartment, signaling that McGraw may withhold consent. Yet McGraw readily allowed Musi to enter. Further, McGraw consented to Squadrito's entry both before and after he secured his dog. McGraw also left his door ajar and his lights on, and told Squadrito of this fact as he left his apartment building, thus suggesting he approved of the officers' entry into his apartment. Moreover, the district court found that the tone of the interaction between McGraw and the officers at all times remained calm and cooperative, and the evidence supports this finding. Finally, McGraw even joked with police about his dog's dislike of officers, suggesting (as the district court held) that McGraw was not overwhelmed by any show of authority.

On the other hand, there is also some evidence that weighs against a finding of voluntariness. Most importantly, in their encounter with McGraw, both Squadrito and Salomon arguably implied that they had a right to search McGraw's apartment without his permission. Further, Squadrito testified that if he were unable to locate McGraw, he "would have made the decision to have contacted the landlord, unlock the door, and made sure

there [were] no human occupants within the dwelling." Had a search resulted merely from the landlord's consent, the exclusionary rule might be triggered. *See Chapman v. United States*, 365 U.S. 610 (1961).

Faced with competing evidence, the district court looked to the "totality of the circumstances" in determining whether McGraw's consent was voluntarily given. The court treated Salomon's and Squadrito's suspect language as a "factor [that] weighs against a finding of voluntary consent," and suggested that even in the presence of such language, the proper inquiry is "whether such claims [of authority] outweigh the other factors suggesting consent was voluntary." That is precisely the approach that we outlined in *United States v. Nafzger*. In that case we referred to an improper claim of police authority as a "factor" that must be "weigh[ed] . . . along with the other factors that *Schneckloth* . . . directs courts to weigh in totality-of-the-circumstances cases." *Nafzger*, 965 F.2d at 216; *see also Bolden v. Se. Penn. Transp. Auth.*, 953 F.2d 807, 824 (3d Cir. 1991) (en banc) ("If the party conducting the search claimed the authority to search without consent, that factor weighs against a finding of voluntary consent."). The district court concluded that the officers' arguable assertions of authority did not outweigh the evidence supporting the conclusion that McGraw's consent was voluntary, namely, McGraw's conduct, his calm cooperation, and his broadly phrased consents following Musi's unambiguous request to inspect his apartment.

The court's finding that McGraw voluntarily consented to the officers' search is certainly "plausible in light of

the record viewed in its entirety." *Raibley*, 243 F.3d at 1076. We are not left with "the definite and firm conviction that a mistake has been committed." *United States v. Rice*, 995 F.2d 719, 722 (7th Cir. 1993). Keeping in mind the deference due the district judge, who is in a superior position to observe the witnesses and determine exactly what happened and how it happened, we conclude that the court did not clearly err.

McGraw, however, argues that *Nafzger* compels the opposite result. We disagree. In *Nafzger*, police went to Nafzger's farm and asserted the right to search his property for a stolen pickup truck based on a legally insufficient search warrant. Nafzger was permitted to read the search warrant and then led officers to a toolshed where the stolen truck was parked. Nafzger later moved to suppress the evidence, and the district court denied his motion. We reversed, holding that Nafzger merely acquiesced to the search based on the officers' false claim of authority. *Nafzger* is distinguishable for several reasons. First, the officers in this case did not make any comparable claim of authority akin to asserting they had a warrant; nor did they, as in *Nafzger*, actually produce one. Second, even if Squadrito and Salomon did claim authority to search—a finding, as we explained above, the district court rejected—their assertions were tempered by Musi's question and McGraw's actions. Third, *Nafzger* does not suggest that an officer's assertion of authority ends the factual inquiry. On the contrary, our opinion recognized that the district court must apply a totality-of-the-evidence analysis even when faced with officers' claims of authority. *Nafzger*, 965 F.2d at 216. Here, the district court did precisely that.

### B.   McGraw's Waiver of His Right to Appeal His Sentence

McGraw also tries to challenge his sentencing classification as a career offender, which increased his guidelines range from 92-115 months to 262-327 months. He argues that fleeing from an officer and intimidating an officer are no longer crimes of violence after *Begay v. United States*, 128 S. Ct. 1581 (2008). We do not address the merits of this question, however; in his plea agreement, McGraw waived his right to appeal his sentence. A knowing and voluntary appeal waiver precludes appellate review, *United States v. Jones*, 381 F.3d 615, 619 (7th Cir. 2004), and McGraw admits that his plea agreement included an unambiguous waiver of his right to challenge the district court's sentencing determinations. He nonetheless argues that because he did not anticipate *Begay*, he could not have knowingly and voluntarily waived his right to appeal based on a *Begay*-type argument.

We have consistently rejected arguments that an appeal waiver is invalid because the defendant did not anticipate subsequent legal developments. In *United States v. Lockwood*, 416 F.3d 604 (7th Cir. 2005), for example, we considered a challenge from a defendant sentenced before the Supreme Court declared the sentencing guidelines advisory in *United States v. Booker*, 543 U.S. 220 (2005). The defendant argued that "his appeal waiver is invalid because the parties and the court failed to anticipate *Booker*." *Lockwood*, 416 F.3d at 607. We instead concluded that

> Lockwood knowingly and intentionally waived his right to appeal his sentence for *any reason*. . . . The fact

that Lockwood, the government, and the district court failed to anticipate *Booker* or its sweeping effect on federal guidelines sentencing does not change this conclusion. There simply is nothing special about *Booker* that would preclude enforcement of an otherwise valid appeal waiver.

*Id.* at 608 (citations omitted).

Our position in *Lockwood* is consistent with our long-expressed view that plea-bargain appeal waivers involve risk:

By binding oneself one assumes the risk of future changes in circumstances in light of which one's bargain may prove to have been a bad one. That is the risk inherent in all contracts; they limit the parties' ability to take advantage of what may happen over the period in which the contract is in effect.

*United States v. Bownes*, 405 F.3d 634, 636 (7th Cir. 2005) (also rejecting the argument that *Booker* created a "sea change" in the law and commenting that in any event, a "'sea change' exception to the rule . . . would be hopelessly vague"). We also noted that our conclusion could differ had the defendant "insisted on an escape hatch that would have enabled him to appeal if the law changed in his favor after he was sentenced." *Id.*

*Lockwood* and *Bownes* thus require that we affirm. By entering into an appeal waiver that did not include an escape hatch of the kind we contemplated in *Bownes*, McGraw relinquished his right to challenge his sentence based on intervening Supreme Court decisions. Moreover,

the case for recognizing any exception after *Begay* is far weaker than the case for recognizing an exception after *Booker*. After all, *Begay* was a statutory-interpretation case, whereas *Booker* invalidated the entire mandatory-guidelines system on constitutional grounds. If a defendant's plea agreement remains knowing and voluntary despite *Booker*, *Begay* cannot command a contrary result. Accordingly, because McGraw's waiver of his right to appeal his sentence is valid, we do not reach the merits of McGraw's sentencing argument.

AFFIRMED.