In the

# United States Court of Appeals
## For the Seventh Circuit

No. 20-2413

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DAVID A. BRIDGEWATER,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Southern District of Illinois.
No. 4:19-cr-40012-SMY-1 — **Staci M. Yandle**, *Judge.*

ARGUED JANUARY 15, 2021 — DECIDED APRIL 28, 2021

Before SYKES, *Chief Judge*, and WOOD and HAMILTON, *Circuit Judges*.

HAMILTON, *Circuit Judge*. In his plea agreement, defendant David Bridgewater waived the right to seek any modification of his sentence. Nonetheless, in light of the current pandemic, Bridgewater filed in the district court a motion for compassionate release under the First Step Act of 2018, as codified in 18 U.S.C. § 3582(c)(1)(A). He seeks release based on medical conditions that he says make him vulnerable to serious illness

or death from the spread of COVID-19 in prison. Bridgewater argues that his plea waiver does not bar this motion because the waiver does not cover compassionate release, was not voluntary, and, in any event, should be unenforceable under contract-law principles of public policy and unconscionability. The district court rejected these arguments. We dismiss the appeal. Bridgewater's knowing and voluntary waiver of the right to seek compassionate release under the First Step Act is enforceable.

I.   *Factual and Procedural Background*

On January 30, 2019, Bridgewater was charged with one count of attempted enticement of a minor in violation of 18 U.S.C. § 2422(b) (Count One) and one count of soliciting an obscene visual depiction of a minor in violation of 18 U.S.C. § 2252A(a)(3)(B) (Count Two). On March 19, 2019, he pleaded guilty to Count Two pursuant to a plea agreement. The government agreed to dismiss Count One, which would have carried a mandatory minimum ten-year sentence, and to recommend a minimum five-year sentence for Count Two. The district court approved the plea agreement on March 19, 2019. Most relevant to this appeal, Bridgewater's plea agreement included the following waiver of his rights to appeal or otherwise challenge his conviction and sentence:

> [I]n exchange for the recommendations and concessions made by the United States in this Plea Agreement, *Defendant knowingly and voluntarily waives the right to seek modification of or contest any aspect of the conviction or sentence in any type of proceeding,* including the manner in which the sentence was determined or imposed, that could be contested under Title 18 or 28, or

> under any other provision of federal law, except that if the sentence imposed is in excess of the Sentencing Guidelines as determined by the Court (or any applicable statutory minimum, whichever is greater), Defendant reserves the right to appeal the substantive unreasonableness of the term of imprisonment.

Dkt. 32, at 7–8 (emphasis in original).

At sentencing, the district court chose to impose an above-guideline sentence of 78 months, plus seven years of supervised release. Bridgewater appealed his sentence, relying on the appellate waiver's exception for an above-guideline sentence. We affirmed his sentence. *United States v. Bridgewater*, 950 F.3d 928, 929 (7th Cir. 2020). Bridgewater is currently imprisoned at the Forrest City Federal Correctional Institution in Arkansas.

On April 30, 2020, Bridgewater filed a motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i), which allows a district court to reduce a defendant's sentence for "extraordinary and compelling reasons." Bridgewater asked the district court to release him for time served due to his medical conditions, which he says present "extraordinary and compelling" reasons for release because they make him especially susceptible to serious illness or death from the COVID-19 outbreak at Forrest City.

Before 2018, only the Bureau of Prisons itself could have filed such a motion on Bridgewater's behalf. In 2018, in response to longstanding criticism over the Bureau's minimal use of compassionate release, Congress enacted § 603(b)(1) of

the First Step Act of 2018 to expand the process to allow defendants to file such motions directly with a district court so long as they first give the Bureau 30 days to act on their requests. See Pub. L. 115-391, 132 Stat. 5194, 5239 (Dec. 21, 2018), codified at 18 U.S.C. § 3582(c)(1)(A); see also Dep't of Justice, Office of the Inspector General, *The Federal Bureau of Prisons' Compassionate Release Program* (Apr. 2013), at 11 (concluding in 2013 that the Bureau "does not properly manage the compassionate release program, resulting in inmates who may be eligible candidates for release not being considered"). Bridgewater invoked this new process to seek compassionate release.

The district court denied Bridgewater's motion on two separate grounds. The court first concluded that, in his plea agreement, Bridgewater voluntarily waived his right to seek compassionate release under the First Step Act and that his waiver is enforceable. The court then concluded that, even if Bridgewater had not waived his right to seek compassionate release, his motion would fail on the merits. The court found that the sentencing factors under 18 U.S.C. § 3553(a) weighed against Bridgewater's release, even assuming that he faced heightened health risks from COVID-19. Judge Yandle explained that reducing Bridgewater's term of imprisonment from six and a half years to less than one year would not reflect the seriousness of his offense, promote respect for law, foster specific deterrence, or protect the public from his potential future crimes. Bridgewater appeals the denial of his compassionate release motion. We have jurisdiction under 18 U.S.C. § 3742(a)(1) and 28 U.S.C. § 1291.

We dismiss the appeal based on the district court's first reason—waiver. Due to the pandemic, we have recently reviewed denials of many motions seeking compassionate release under the First Step Act.[1] We have not yet addressed the waiver issue presented in this case. In his plea agreement, Bridgewater voluntarily waived "the right to seek modification of or contest any aspect of the conviction or sentence in any type of proceeding." We hold that this waiver included Bridgewater's right to seek compassionate release under the First Step Act and that his knowing and voluntary waiver of that right in an approved plea agreement is enforceable. We dismiss this appeal without reaching the merits of Bridgewater's motion.

Part II explains why Bridgewater's waiver included his right to seek compassionate release. Part III briefly explains why his waiver was knowing and voluntary. Part IV addresses Bridgewater's unenforceability arguments. After setting the legal landscape in Parts IV-A and IV-B, we explain in Part IV-C why Bridgewater's public policy and unconscionability arguments are not persuasive.

II. *Scope of the Waiver*

We review *de novo* the enforceability of an appellate waiver in a plea agreement. *United States v. Chapa*, 602 F.3d 865, 868

---

[1] For cases reviewing pandemic-related compassionate release motions under the First Step Act, see, e.g., *United States v. Sanders*, 992 F.3d 583 (7th Cir. 2021); *United States v. Joiner*, 988 F.3d 993 (7th Cir. 2021); *United States v. Williams*, 987 F.3d 700 (7th Cir. 2021); *United States v. Saunders*, 986 F.3d 1076 (7th Cir. 2021); *United States v. Sanford*, 986 F.3d 779 (7th Cir. 2021); *United States v. Gunn*, 980 F.3d 1178 (7th Cir. 2020). We have also recently issued numerous non-precedential orders affirming the denial or dismissal of such motions.

(7th Cir. 2010). We generally enforce an appellate waiver if its terms are express and unambiguous and the record shows that it was knowing and voluntary. *Id.* In determining the scope of a waiver, we "interpret the terms of the agreement according to the parties' reasonable expectations and construe any ambiguities against the drafter—the government—and in favor of the defendant." *United States v. Woods*, 581 F.3d 531, 534 (7th Cir. 2009), overruled on other grounds, *United States v. Taylor*, 778 F.3d 667 (7th Cir. 2015). This approach ensures that waivers are not applied loosely in ways that unnecessarily limit review and "'discredit' the legitimacy of the sentencing process." *United States v. Ready*, 82 F.3d 551, 556 (2d Cir. 1996), quoting *United States v. Mezzanatto*, 513 U.S. 196, 204 (1995).

Here, the "express and unambiguous" text of Bridgewater's waiver confirms that it extends to compassionate release. Bridgewater waived "the right to seek modification of … any aspect of the … sentence." Compassionate release under 18 U.S.C. § 3582(c)(1)(A) is clearly a form of sentence modification. The heading to § 3582(c) reads "Modification of an imposed term of imprisonment," and compassionate release is just one of several modifications authorized in that subsection.

Bridgewater's waiver was written broadly to reach his rights to appeal and to bring a habeas corpus petition under 28 U.S.C. § 2255, as well as his right "to seek modification of or contest any aspect of the conviction or sentence in any type of proceeding." The waiver applies to proceedings "under Title 18 or 28, or under any other provision of federal law … ."

The waiver's broad language and reference to "modify" make clear that the waiver was not limited to direct appeals

and § 2255 petitions. Motions to modify sentences exhibit "a fundamentally different character than an appeal or collateral attack." *United States v. Monroe*, 580 F.3d 552, 557 (7th Cir. 2009). Sentence modification motions do not "seek to impugn the district court's rationale, nor … claim that the district court erred in any way by imposing" the defendant's sentence. *Id.* They instead ask the court to impose a new sentence for reasons unrelated to the legality of the original sentence. Bridgewater waived his right to seek modification of his sentence in 2019, after the First Step Act gave incarcerated people the right to seek modification without the support of the Bureau of Prisons. In other words, this type of modification proceeding was known and available when Bridgewater agreed not to use it.[2] Accordingly, Bridgewater's waiver, barring him from "seek[ing] modification of … any aspect of [his] … sentence," applies to his right to seek compassionate release under 18 U.S.C. § 3582(c)(1)(A).

III. *Knowing and Voluntary Waiver*

The record establishes that Bridgewater knowingly and voluntarily entered into this plea agreement with this broad waiver. As noted, Bridgewater and his attorney were on notice of the rights he might be waiving under the First Step Act. His Rule 11 plea colloquy confirmed that he understood his waiver:

---

[2] This case is therefore distinguishable from *United States v. Glasper*, No. 3:11-CR-30053, 2020 WL 6363703 (S.D. Ill. Oct. 29, 2020), where the district court found that an appellate waiver did not foreclose the right to seek compassionate release because it was entered into *before* the First Step Act was enacted. We express no view on the issue in *Glasper*, where an appeal is pending. Bridgewater signed his plea agreement in 2019, after the First Step Act took effect.

Q:  All right. And in terms of, finally, waiving your appeal rights. [The prosecutor] mentioned certain waivers that are part of the Plea Agreement. Did you specifically have a chance to discuss those waivers with your attorney … so that you understand what rights to appeal you are actually waiving in exchange for the agreement?

A:  Yes ma'am.

The entire Rule 11 colloquy, including that exchange about the waiver itself, was enough to confirm that Bridgewater's plea, including the waiver, was knowing and voluntary. See *United States v. Jones*, 381 F.3d 615, 619 (7th Cir. 2004) ("Voluntariness of a guilty plea is ensured by a court's compliance with Federal Rule of Criminal Procedure 11.").

The change of circumstances brought on by the pandemic does not render Bridgewater's earlier waiver unknowing or involuntary. "At worst, he did not fully appreciate that he might wish to change his mind later … . Yet, such is the risk with plea-bargaining and waiver." *United States v. Alcala*, 678 F.3d 574, 580 (7th Cir. 2012) (affirming waiver of defendant's right to withdraw his plea agreement); see also *United States v. McGraw*, 571 F.3d 624, 630–31, quoting *United States v. Bownes*, 405 F.3d 634, 636 (7th Cir. 2005) ("In a contract (and equally in a plea agreement) one binds oneself to do something that someone else wants, in exchange for some benefit to oneself. By binding oneself one assumes the risk of future changes in circumstances in light of which one's bargain may

prove to have been a bad one. That is the risk inherent in all contracts.").[3]

IV. *Compassionate Release Waivers in Approved Plea Agreements Are Enforceable*

We now turn to Bridgewater's most substantial attacks on his waiver. He argues that even if he knowingly and voluntarily waived his right to seek compassionate release under the First Step Act, the waiver should not be enforced because it is contrary to public policy and unconscionable. While we respect the concerns that give rise to these arguments, we ultimately disagree. As an initial matter, it is unclear whether contract law's public policy and unconscionability doctrines fully extend to plea agreements. Even if they do, we are convinced that an approved plea agreement that waives the right to file compassionate release motions under the First Step Act is not unenforceable on public policy or unconscionability grounds.

We base this conclusion on two major premises. First, statutory rights are presumed to be waivable in plea agreements, just as most constitutional rights are waivable. See *United States v. Mezzanatto*, 513 U.S. 196 (1995). Second, compassionate release waivers are more defensible against public policy

---

[3] It is true that contract law allows for some unusual and unpredictable events to relieve a party of agreed obligations, such as through the doctrine of *force majeure* or so-called Acts of God. See generally Restatement (Second) of Contracts 11 Intro. Note (Am. L. Inst. 1981). In contracts, parties may and often do bargain over the scope of such terms, and the more general doctrine fills in the blanks when parties do not address them explicitly. Those doctrines, however, clearly do not apply here to relieve Bridgewater of his obligations under the waiver term of his plea agreement, and he does not rely on them.

and unconscionability challenges than § 1983 release-dismissal agreements, which the Supreme Court has held are generally enforceable. See *Town of Newton v. Rumery*, 480 U.S. 386 (1987).

A.  *Rights Presumed Waivable in Plea Agreements*

Bridgewater's argument runs up against the general principle that statutory rights are waivable in plea agreements, at least where Congress has not signaled otherwise. The Supreme Court clarified this presumption in *Mezzanatto*, where it enforced a defendant's voluntary waiver of a protection under Federal Rule of Evidence 410, which normally bars the government from impeaching defendants with statements made during plea negotiations. Mezzanatto had agreed to enter plea negotiations on the condition that—despite Rule 410—anything he said during the negotiation *would* be admissible to impeach him if his case went to trial. The plea discussions eventually broke down, and at trial the prosecution was allowed to cross-examine Mezzanatto with statements he had made during negotiations. The Ninth Circuit reversed, ruling that Rule 410 is not waivable because its text does not expressly allow waiver.

The Supreme Court reversed, emphasizing that the circuit's analysis was "directly contrary to the approach we have taken in the context of a broad array of constitutional and statutory provisions. Rather than deeming waiver presumptively unavailable absent some sort of express enabling clause, we instead have adhered to the opposite presumption." *Mezzanatto*, 513 U.S. at 200–01. The Court emphasized that defendants may waive even fundamental constitutional rights. *Id.* at 201, citing *Ricketts v. Adamson*, 483 U.S. 1, 10 (1987) (double jeopardy defense); *Boykin v. Alabama*, 395 U.S. 238, 243 (1969)

(guilty plea waives privilege against compulsory self-incrimination, right to jury trial, and right to confront one's accusers); *Johnson v. Zerbst*, 304 U.S. 458, 465 (1938) (Sixth Amendment right to counsel may be waived). The Court concluded that the same presumption should apply to statutory rights unless Congress says otherwise: "absent some affirmative indication of Congress' intent to preclude waiver, we have presumed that statutory provisions are subject to waiver by voluntary agreement of the parties." *Mezzanatto*, 513 U.S. at 201.

The Court bolstered this conclusion by reference to *Crosby v. United States*, 506 U.S. 255 (1993), and *Smith v. United States*, 360 U.S. 1 (1959), which showed that Congress knows how to create non-waivable rights for the accused when it wishes. Both cases addressed protections in the Federal Rules of Criminal Procedure that limit when they can be waived. See *Crosby*, 506 U.S. at 258–60 (text of Rule 43 provides that right to be present at one's own trial is waivable only when the defendant "is voluntarily absent after the trial has commenced"); *Smith*, 360 U.S. at 9 (text of Rule 7(a) provides that indictment requirement "may be waived, but only in those proceedings which are noncapital"). *Mezzanatto* explained that the explicit limits on waivers in Rules 7(a) and 43 and the history of the pertinent rights indicated an intent to preclude waiver in other, unstated circumstances. 513 U.S. at 201. By contrast, a rule's complete silence as to waiver, *Mezzanatto* reasoned, should leave in place the general presumption that statutory or rules-based rights are waivable. *Id*. at 201–02. That description fits the new statutory right to seek compassionate release.

Accordingly, we have enforced waivers of a broad array of statutory rights by plea agreement, including appellate

rights. See, e.g., *United States v. Hare*, 269 F.3d 859, 863 (7th Cir. 2001); *United States v. Feichtinger*, 105 F.3d 1188, 1190 (7th Cir. 1997) ("The right to appeal is a statutory right, and like other rights—even constitutional rights—which a defendant may waive, it can be waived in a plea agreement."). We have also enforced waivers of appeals "based on intervening Supreme Court decisions," *McGraw*, 571 F.3d at 631, and "based on the ineffectiveness of [] counsel at sentencing," *United States v. Smith*, 759 F.3d 702, 707 (7th Cir. 2014) (collecting cases). The waivers enforced in *McGraw* and *Smith*, like the waiver here, extended to circumstances that defendants probably could not foresee when signing their agreements.

B.  *Narrow Due Process Limits*

The Due Process Clause of the Fifth Amendment places some limits on waivers of rights in plea agreements. "A plea agreement is a type of contract subject to contract law principles tempered by limits that the Constitution places on the criminal process." *Chapa*, 602 F.3d at 868, citing *Bownes*, 405 F.3d at 636. These constitutional limits do not invalidate the waiver here.

For instance, waivers of the right to effective counsel *during the plea negotiation process* are not enforceable because ineffective counsel undermines the voluntariness of the plea. *Hurlow v. United States*, 726 F.3d 958, 965 (7th Cir. 2013) ("[A] valid appellate waiver contained in a plea agreement does not preclude a defendant's claim that the plea agreement itself was the product of ineffective assistance of counsel."), quoting *United States v. Hodges*, 259 F.3d 655, 659 n.3 (7th Cir. 2001). We have also suggested, but not held, that a plea agreement might not be voluntary if the defendant waived the right un-

der *Brady v. Maryland*, 373 U.S. 83 (1963), to receive "exculpatory evidence of actual innocence" before pleading guilty. See *McCann v. Mangialardi*, 337 F.3d 782, 787–88 (7th Cir. 2003) (distinguishing evidence of actual innocence from impeachment evidence, which, under *United States v. Ruiz*, 536 U.S. 622 (2002), need not be disclosed during plea-bargaining to ensure that guilty plea is knowing and voluntary). Similarly, sentences that are based on race, *United States v. Hicks*, 129 F.3d 376, 377 (7th Cir. 1997), or that exceed statutory maximums, *Feichtinger*, 105 F.3d at 1190, may be challenged despite an otherwise valid appellate waiver.

None of these due process limits apply, however, to a waiver of compassionate release under the First Step Act. Enforcing that waiver does not fundamentally infect the voluntariness of the plea because the extraordinary circumstances that invoke compassionate release occur after sentencing. They have nothing to do with misconduct during the plea negotiation process.

Moreover, unlike a waiver of appeal for a sentence based on race or in excess of a statutory maximum, compassionate release waivers serve legitimate finality and resource interests. See below, Part IV-C. Such waivers stop defendants only from petitioning the district court directly, without approval of the Bureau of Prisons. Defendants can still seek compassionate release through the original Bureau process, which was the only available route for decades. It would thus be odd if a defendant's decision to revert back to his pre-2018 rights violated the bare "minimum of civilized procedure." See *United States v. Josefik*, 753 F.2d 585, 588 (7th Cir. 1985). That would imply that the law governing the compassionate re-

lease process until 2018 was and always had been unconstitutional. No one suggests that. Nor does the Constitution grant or imply a right to seek or obtain from a court compassionate release from an otherwise lawful sentence, outside of executive pardons and clemency.

It is also important to remember that even if a federally incarcerated person cannot petition directly for compassionate release due to medical conditions, he may still directly challenge any inadequate medical care he receives, or any medically unsafe conditions of confinement. See, e.g., *Helling v. McKinney*, 509 U.S. 25, 33 (1993) (affirming courts' ability under Eighth Amendment to enjoin unsafe conditions that will likely affect an incarcerated person's health: "We have great difficulty agreeing that prison authorities may not be deliberately indifferent to an inmate's current health problems but may ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year."); *Fields v. Smith*, 653 F.3d 550, 559 (7th Cir. 2011) (affirming injunction against denial of therapy to certain incarcerated people); see also *Carlson v. Green*, 446 U.S. 14 (1980) (*Bivens* action for damages available where federal officials violate Eighth Amendment through deliberate indifference to serious medical needs). Accordingly, waiver of a right to seek compassionate release under the First Step Act does not inherently violate any constitutional limits on plea agreements.

C.  *Public Policy and Unconscionability*

Bridgewater argues primarily that his compassionate re-
lease waiver is unenforceable as a matter of contract law be-
cause it contravenes public policy and is unconscionable.[4] In
support, Bridgewater cites *United States v. Osorto*, 445 F. Supp.
3d 103, 105 (N.D. Cal. 2020), in which Judge Charles Breyer
rejected a plea agreement that contained a compassionate re-
lease waiver. He wrote that such a waiver "undermines Con-
gressional intent and is an unconscionable application of a
federal prosecutor's enormous power to set the terms of a plea
agreement." *Id.*

We respectfully disagree, but we note that the issue in
*Osorto* arose in a different way, and the procedural difference
is important. In this case, the district court had approved and
implemented the plea agreement. Bridgewater had already
received substantial benefits under that agreement. Judge
Breyer rejected a *proposed* waiver in *Osorto*, relying on a dis-
trict judge's "broad discretion to accept or reject a proposed

---

[4] As an initial matter, it remains undecided in this circuit whether plea
provisions are even subject to public policy and unconscionability chal-
lenges in the same way that other contracts are. The Second Circuit has
said they are. See *United States v. Ready*, 82 F.3d 551, 559 (2d Cir. 1996),
superseded on other grounds by *United States v. Cook*, 722 F.3d 477, 481
(2d Cir. 2013). A divided panel of the D.C. Circuit recently joined this view
in *Price v. Dep't of Justice*, 865 F.3d 676 (D.C. Cir. 2017), where it held that
plea provisions must serve legitimate criminal-justice interests that out-
weigh any public policy concerns in enforcing such provisions. See 865
F.3d at 681, 683. We have not explicitly adopted such a rule. While plea
agreements are "usefully viewed through the lens of contract law,"
*Bownes*, 405 F.3d at 636, we have repeatedly said that they are enforceable
so long as they are entered into "knowingly and voluntarily." See, e.g.,
*Smith*, 759 F.3d at 706.

plea agreement." *Id.* at 104; see Fed. R. Crim. P. 11(c)(3). Here, Judge Yandle accepted Bridgewater's plea agreement back in 2019 and acted accordingly. Our issue is whether the waiver term of the agreement can now be enforced after Bridgewater has received the benefits of the agreement. So while we disagree with *Osorto*'s analysis of the public policy and unconscionability issues concerning compassionate release waivers, we do not address here the scope of a district judge's discretion to reject the terms of a proposed plea agreement in the first instance.

Regarding public policy, *Osorto* concluded that a compassionate release waiver undermines congressional intent because it "neatly undoes Congress's work" and "restores the very obstacles the First Step Act removed." 445 F. Supp. 3d at 108. As to unconscionability, *Osorto* said that compassionate release waivers are "appallingly cruel" because they permanently stifle defendants' ability to seek relief in "tragically unforeseeable" circumstances in which continued imprisonment no longer serves any penological purpose. *Id*. at 109. This left Judge Breyer asking: "why? Why would federal prosecutors exercise the tremendous discretion entrusted to them with such a lack of compassion?" *Id*. at 110.

We believe there is an answer to *Osorto*'s "why?"—one that assures us that compassionate release waivers are at least not so indefensible as to be inherently unconscionable or against public policy. In short, the answer is that compassionate release waivers—like other appellate waivers—sacrifice an opportunity for review in order to advance the government's legitimate interest in finality and the efficient use of prosecutorial resources, and in exchange for some other benefit that the defendant values more highly.

We disagree with *Osorto*'s assertion that Congress silently intended the First Step Act's new compassionate release right to be non-waivable. The very nature of any waiver of a statutory right is that it "neatly undoes Congress's work." See *id.* at 108. Nor is the First Step Act unusual in remedying a decades-long problem. New rights often address old problems. *Mezzanatto* held in 1995 that such statutory rights are presumptively waivable, and that has been the rule ever since. When Congress passed the First Step Act in 2018, it was certainly on notice of the legal effect of its silence as to waiver. Until Congress says otherwise, the better course is to allow defendants to waive this new right for something they value more in return. "Often a big part of the value of a right is what one can get in exchange for giving it up." *United States v. Barnett*, 415 F.3d 690, 692 (7th Cir. 2005).

Beyond congressional intent, *Osorto*'s broader policy and unconscionability concerns do not persuade us to void compassionate release waivers in approved plea agreements. Those concerns are twofold. First, *Osorto* suggests that there is no legitimate prosecutorial reason for compassionate release waivers. Second, a defendant waives the right to seek compassionate release at a time when he cannot foresee it becoming salient. But if and when it later does, it becomes extremely salient, and he is then trapped in promises made by his earlier, less desperate self.

We recognize the humane foundation for the second concern. But we enforce waivers in other scenarios presenting similar concerns, such as when defendants waive future appeals that may be based on unforeseen changes to Supreme Court precedent or the Sentencing Guidelines. See above, Part IV-A, discussing *McGraw*, 571 F.3d at 631, and *Smith*, 759 F.3d

at 707. Moreover, defendants who waive their First Step Act rights can still petition the Bureau of Prisons for compassionate release. That provides a safety valve, albeit one not in the control of the defendant.

As to the first concern about legitimate prosecutorial interests, *Osorto* presented the issue as if every motion for compassionate release were meritorious. If that were true, there might be no valid reason to keep defendants from filing such motions. But as with other appeals, not all are meritorious or even plausible. During the pandemic alone, we have affirmed many denials of compassionate release. So on the other side of the ledger there are legitimate prosecutorial interests in efficiency and finality that weigh against the interest in allowing defendants to petition directly for modification.

*Town of Newton v. Rumery*, 480 U.S. 386 (1987), is instructive on this point. In that case, the Supreme Court assessed the enforceability of "release-dismissal agreements" in which an accused defendant releases his right to file a civil § 1983 action in return for the dismissal of criminal charges against him. 480 U.S. at 389. Rumery argued that his release-dismissal agreement was contrary to public policy and unconscionable. The Court, however, rejected those arguments. It held that release-dismissal agreements are not *per se* unenforceable and instead should be assessed case by case. Critically, the Court generally upheld the enforceability of release-dismissal agreements based on the same efficiency and finality interests that we see here:

> [A] *per se* rule of invalidity fails to credit other relevant public interests … . No one suggests that all such suits are meritorious. Many are marginal and some are frivolous. Yet even when

> the risk of ultimate liability is negligible, the burden of defending such lawsuits is substantial. … This diversion of officials from their normal duties and the inevitable expense of defending even unjust claims is distinctly not in the public interest. To the extent release-dismissal agreements protect public officials from the burdens of defending such unjust claims, they further this important public interest.

*Rumery*, 480 U.S. at 395–96 (plurality opinion); *id.* at 399–400 (O'Connor, J., concurring) (same).

These interests in efficient resource allocation and finality apply to compassionate release motions under the First Step Act. There is no obvious limit on how many motions a defendant can file. The statutory standard, "extraordinary and compelling reasons," is flexible and can be interpreted expansively by incarcerated people seeking modifications. Nor are there obvious limits on information that a district court may consider in deciding such a motion. A motion for compassionate release thus creates the prospect that all sentencing factors under § 3553(a) could be in play, updated from the original sentencing. Cf. *Pepper v. United States*, 562 U.S. 476, 489 (2011) (in case of resentencing after appellate reversal, stressing "traditional discretion of sentencing courts to 'conduct an inquiry broad in scope, largely unlimited either as to the kind of information [they] may consider, or the source from which it may come.'"), quoting *United States v. Tucker*, 404 U.S. 443, 446 (1972). Accordingly, as with appellate waivers, compassionate release waivers can serve legitimate interests. There are certainly important and humane interests on the other side. But the competing interests persuade us that knowing and

voluntary compassionate release waivers are not so cruel or unreasonable as to render them unconscionable.

Compassionate release waivers also do not present the concerns that made *Rumery* a close case. *Rumery* recognized that release-dismissal agreements create conflicts of interest that can motivate prosecutors and police to engage in unethical and illegal conduct. First, a suspect's ability to waive § 1983 claims reduces the legal incentives that discourage police officers from violating a suspect's constitutional rights. Second, once a constitutional violation occurs, the natural desire to avoid liability "may tempt prosecutors to bring frivolous charges, or to dismiss meritorious charges, to protect the interests of other officials." *Rumery*, 480 U.S. at 395 (plurality opinion). In fact, "the prosecutor's interest in obtaining a covenant not to sue will be strongest in those cases in which he realizes that the defendant was innocent and was wrongfully accused." *Id.* at 409 (Stevens, J., dissenting). Hence, "[t]he central problem with the release-dismissal agreement is that public criminal justice interests are explicitly traded against the private financial interest of the individuals involved in the arrest and prosecution." *Id.* at 401 (O'Connor, J., concurring).

These corrupting influences are not present with compassionate release waivers. Prosecutors may be motivated to reduce litigation but would have no reason to expect these waivers could shield their own abuses or those of police. Compassionate release waivers by their very nature affect unforeseen circumstances that arise long after the prosecution and police's interactions with the defendant.

Compassionate release waivers are also more defensible than the plea waiver invalidated in *Price v. Dep't of Justice*, 865 F.3d 676 (D.C. Cir. 2017). In *Price*, the D.C. Circuit held that a

defendant's waiver of Freedom of Information Act rights in a plea agreement was unenforceable as against public policy. In reaching that conclusion, *Price* emphasized that FOIA waivers can prevent defendants from uncovering files that reveal ineffective assistance of counsel or prosecutorial misconduct in their cases. 865 F.3d at 682. So, unlike compassionate release waivers, FOIA waivers could undercut defendants' non-waivable right to effective counsel during plea negotiations. *Id.* Moreover, like release-dismissal agreements, FOIA waivers raise concerns about shielding government abuse that simply do not apply to compassionate release waivers.

Finally, in this case, the fact that Bridgewater has already reaped the benefits of his plea agreement bolsters our conclusion that it is not unconscionable to enforce his waiver. In return for his waiver and other promises in his agreement, Bridgewater received a substantial benefit—dismissal of a charge that carried a ten-year mandatory minimum sentence. Now that the government has delivered on the substantial benefits it promised him, it is not unconscionable to hold Bridgewater to his end of the bargain. In the end, Bridgewater "wants the benefits of the existing agreement but not the principal detriment." *United States v. Wenger*, 58 F.3d 280, 283 (7th Cir. 1995). "That is the one outcome that would be most destructive of the plea agreement process. Defendants must take the bitter with the sweet." *Id*.

## *Conclusion*

A district court has discretion to approve and enforce a knowing and voluntary plea agreement that waives the defendant's right to seek compassionate release under the First Step Act. Bridgewater's waiver was knowing and voluntary,

and he has already received a substantial benefit under the agreement. His appeal is DISMISSED