21-32-cv
JN Contemporary Art LLC v. Phillips Auctioneers LLC

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT
_____

August Term, 2021

(Argued: August 19, 2021                    Decided: March 23, 2022)

Docket No. 21-32-cv


_____



JN Contemporary Art LLC,

*Plaintiff-Appellant*,

v.

Phillips Auctioneers LLC,

*Defendant-Appellee*.


_____

Before: POOLER, RAGGI, and CHIN, *Circuit Judges*.

Appeal from the December 17, 2020 judgment of the United States District Court for the Southern District of New York (Cote, *J.*). Phillips Auctioneers LLC invoked the force majeure clause to terminate its agreement to sell a Rudolf

Stingel painting on behalf of JN Contemporary Art LLC, citing the COVID-19 pandemic and state government orders requiring nonessential businesses to cease in-person operations. JN sued for breach of contract, breach of the implied covenant of good faith and fair dealing, breach of fiduciary duty, and equitable estoppel. Phillips moved to dismiss the complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). The district court granted the motion, finding the pandemic constituted "a circumstance beyond the parties' reasonable control" as contemplated by their agreement. We agree.

Affirmed.

_____

RUSSELL I. ZWERIN, Aaron Richard Golub, Esquire, P.C. (Aaron Richard Golub, Nehemiah S. Glanc, *on the brief*), New York, NY, *for Plaintiff-Appellant JN Contemporary Art LLC.*

LUKE NIKAS, Quinn Emanuel Urquhart & Sullivan, LLP (Maaren A. Shah, Neil T. Phillips, *on the brief*), New York, NY, *for Defendant-Appellee Phillips Auctioneers LLC.*

POOLER, *Circuit Judge*:

Phillips Auctioneers LLC invoked the force majeure clause to terminate its agreement to sell a Rudolf Stingel painting on behalf of JN Contemporary Art LLC, citing the COVID-19 pandemic and state government orders requiring

nonessential businesses to cease in-person operations. JN sued for breach of contract, breach of the implied covenant of good faith and fair dealing, breach of fiduciary duty, and equitable estoppel. Phillips moved to dismiss the complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). The United States District Court for the Southern District of New York (Cote, *J.*) granted the motion, concluding that the pandemic constituted "a circumstance beyond the parties' reasonable control," as contemplated by their agreement. On de novo review, we affirm.

**BACKGROUND**

JN buys, sells, and exhibits works of art. Phillips is an auction house that takes works of art on consignment for auction. In June 2019, JN and Phillips entered into two agreements. The first (the "Basquiat Agreement") required JN to bid £3,000,000 for *Untitled*, by Jean-Michel Basquiat (the "Basquiat Painting") when Phillips auctioned it during its 20th Century & Contemporary Art Evening Sale scheduled to take place in London in June 2019. Phillips agreed to pay JN a financing fee of 20 percent of the sale amount above £3,000,000. The Basquiat Agreement was "[c]onditional upon signature by [JN] of the Consignment Agreement with Guarantee of Minimum Price in respect of the work by Rudolf

3

Stingel, *Untitled, 2009* . . . and conditional upon the [Basquiat Painting] being offered for sale with a commitment by Phillips to pay the Seller a Guaranteed Minimum[.]" App'x at 50.

On the same day, the parties entered into the second agreement (the "Stingel Agreement"), which required JN to consign to Phillips *Untitled, 2009*, a painting by Rudolph Stingel (the "Stingel Painting"), with a guaranteed minimum amount of $5,000,000 to be paid to JN. The Stingel Agreement stipulated that the painting was to be "offered for sale in New York in [Phillips's] major spring 2020 evening auction of 20th Century & Contemporary Art currently scheduled for May 2020" (the "New York Auction"). App'x at 56.

The Stingel Agreement contained a force majeure clause:

> In the event that the auction is postponed for circumstances beyond our or your reasonable control, including, without limitation, as a result of natural disaster, fire, flood, general strike, war, armed conflict, terrorist attack or nuclear or chemical contamination, we may terminate this Agreement with immediate effect. In such event, our obligation to make payment of the Guaranteed Minimum shall be null and void and we shall have no other liability to you.

App'x at 60 ¶ 12(a). The Stingel Agreement also allowed Phillips "the sole right in our reasonable discretion, and as we deem appropriate: (i) to select, change or

reschedule the place, date and time for the auction but any change to a later date than May 2020 would be subject to [JN's] prior written consent[.]" App'x at 56.

Both parties performed as required by the Basquiat Agreement. JN obtained a $5,000,000 loan from Muses Funding I LLC secured by the Stingel Painting. In December 2019, JN, Phillips, and Muses entered into an amendment to the Stingel Agreement that memorialized the Muses lien (the "Security Amendment"). The Security Amendment required the Stingel Painting to be sold "during the 20th Century & Contemporary Art—NY Auction to be held by Phillips in New York in May 2020." App'x at 67 ¶ 1(c).

In March 2020, in response to the COVID-19 pandemic, then-New York Governor Andrew Cuomo issued a series of executive orders that eventually banned nearly all nonessential in-person business activities, including art exhibitions and auctions. Phillips posted a public announcement on its website on March 14 stating:

> As more of our community of staff, clients and partners becomes affected by the spread of the Coronavirus, we have decided **to postpone all of our sales and events in the Americas, Europe and Asia**. . . . Our upcoming 20th Century & Contemporary Art sales in New York will be held the week of 22 June 2020, consolidating New York and London sales into one week of auctions.

App'x at 114 (bolding in original). An event entitled "20TH CENTURY AND CONTEMPORARY ART EVENING SALE, NEW YORK AUCTION," was eventually held on July 2, 2020, using a remote format.

On June 1, 2020, Phillips terminated the Stingel Agreement via electronic message:

> As you are well aware, due to the COVID-19 pandemic, since mid-March 2020 the New York State and New York City governments placed severe restrictions upon on all non-essential business activities. Certain government orders were invoked that applied to and continue to apply to Phillips' business activities.
>
> Due to these circumstances and the continuing government orders, we have been prevented from holding the Auction and have had no choice but to postpone the Auction beyond its planned May 2020 date.
>
> We are hereby giving you notice with immediate effect that: (1) Phillips is invoking its right to terminate the [Stingel Agreement]; (2) Phillips' obligation to make payment of the Guaranteed Minimum to you for the Property is null and void; and (3) Phillips shall have no liability to you for such actions that [are] required under applicable governing law.
>
> Our rights to act are as mutually agreed by you and us and are clearly set out in [the termination clause of the Stingel Agreement] . . . .

App'x at 118. This notice was also mailed to JN on June 2, 2020.

JN sued Phillips on June 8, 2020, and on the same day moved for a preliminary injunction and temporary restraining order to compel Phillips to offer the Stingel Painting at its next auction. On July 15, the district court denied the motion for a temporary restraining order. *JN Contemporary Art LLC v. Phillips Auctioneers LLC,* 472 F. Supp. 3d 88, 89 (S.D.N.Y. 2020). Phillips moved to dismiss, JN filed a second amended complaint, and Phillips again moved to dismiss. The district court granted the motion. *JN Contemporary Art LLC v. Phillips Auctioneers LLC,* 507 F. Supp. 3d 490 (S.D.N.Y. 2020). Principally, the district court concluded that the COVID-19 pandemic fell within the Stingel Agreement's force majeure clause, and thus there was no breach of the agreement. This appeal followed.

## DISCUSSION

We review de novo a district court's Rule 12(b)(6) dismissal. *Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016). So long as an agreement is "complete, clear and unambiguous on its face," under New York law it is "enforced according to the plain meaning of its terms." *Eternity Glob. Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004) (internal quotation marks omitted). Contractual claims

7

unambiguously barred by an agreement between the parties may be determined on a motion to dismiss. *Edwards v. Sequoia Fund, Inc.*, 938 F.3d 8, 13 (2d Cir. 2019).

**I.     Force Majeure**

JN first argues that because the Stingel Agreement did not specifically require Phillips to auction off the Stingel Painting live at the New York Auction in May 2020, Phillips should have held the auction in another format, or delayed it to some point in the future. We disagree. The Stingel Agreement provided that the Stingel Painting "shall be offered for sale in New York at our major spring 2020 evening auction of 20th Century & Contemporary Art currently scheduled for May 2020." App'x at 56 ¶ 6(a). As JN itself alleged, the New York Auction is a well-known event in the industry, taking place takes place annually in May. The language of the agreement is unambiguous: it obligated Phillips to auction the Stingel Painting for at least the Guaranteed Minimum at the May 2020 New York Auction. Nothing in the agreement obligated Phillips to sell the Stingel Painting at a different auction, at a later time, or via different format. It is true, as JN argues, that Phillips could have chosen to offer some sort of alternative performance, but that is not the same as the Stingel Agreement requiring Phillips to provide anything other than the bargained-for performance. *See, e.g.,* *Harriscom Svenska, AB v. Harris Corp.*, 3 F.3d 576, 580 (2d Cir. 1993) (noting that

8

when defendant was excused from performance by force majeure, defendant was not required to "provide substitute performance."). The Stingel Agreement contains no such requirement.

We turn, then, to the issue of whether Phillips properly terminated the Stingel Agreement. A force majeure clause's primary purpose is to "relieve a party from its contractual duties when its performance has been prevented by a force beyond its control or when the purpose of the contract has been frustrated." *Phillips Puerto Rico Core, Inc. v. Tradax Petroleum, Ltd.*, 782 F.2d 314, 319 (2d Cir. 1985). "[W]hen the parties have themselves defined the contours of force majeure in their agreement, those contours dictate the application, effect, and scope of force majeure." *Constellation Energy Servs. of N.Y., Inc. v. New Water St. Corp.*, 46 N.Y.S.3d 25, 27 (1st Dep't 2017) (alteration in original) (internal quotation marks omitted).

The force majeure clause here provided in relevant part that "[i]n the event that the auction is postponed for circumstances beyond our or your reasonable control, including, without limitation, as a result of natural disaster, fire, flood, general strike, war, armed conflict, terrorist attack or nuclear or chemical contamination, we may terminate this Agreement with immediate effect." App'x

9

at 60 ¶ 12(a). The district court found that "[i]t cannot be seriously disputed that the COVID-19 pandemic is a natural disaster." *JN Contemporary*, 507 F. Supp. 3d at 501. JN argues that whether COVID-19 is a naturally occurring virus or one created by man is unsettled, such that the district court erred in deeming the pandemic a natural disaster as a matter of law. Instead, JN contends, it is an open question of material fact, and that JN is entitled to discovery as to "whether COVID-19 escaped from one of two labs in Wuhan working on coronaviruses or whether such labs [] genetically engineer[ed]" the COVID-19 virus. Appellant's Br. at 30. JN also argues that "[n]atural disasters are localized events resulting from natural processes of the earth—*i.e.*, hurricanes, tsunamis, earthquakes, tornadoes and other geological processes—that generally are geographically contained and relatively short in duration." Appellant's Br. at 33.

We need not address these arguments to decide this appeal. We hold that the COVID-19 pandemic and the orders issued by New York's governor that restricted how nonessential businesses could conduct their affairs during the pandemic, constituted "circumstances beyond our or your reasonable control," App'x at 60 ¶ 12(a). Thus, we affirm the district court's dismissal of the second amended complaint on that ground without resolving the question of whether

10

COVID-19 is a natural disaster within the meaning of the force majeure clause. *See Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 405 (2d Cir. 2006) ("[W]e are free to affirm a decision on any grounds supported in the record . . . .").

New York law requires courts to construe force majeure clauses narrowly, so that "only if the *force majeure* clause specifically includes the event that actually prevents a party's performance will that party be excused." *Kel Kim Corp. v. Cent. Mkts., Inc.*, 70 N.Y.2d 900, 902-03 (1987). A narrow construction also applies when the force majeure clause contains a "catchall," such as "or other similar causes beyond the control of such party," cabining the meaning to "things of the same kind or nature as the particular matters mentioned." *Id.* at 903; *see also Team Mktg. USA Corp. v. Power Pact, LLC*, 839 N.Y.S.2d 242, 246 (3d Dep't 2007) ("When the event that prevents performance is not enumerated, but the clause contains an expansive catchall phrase in addition to specific events, the precept of *ejusdem generis* as a construction guide is appropriate . . . ." (internal quotation marks omitted)).

Here, the COVID-19 pandemic, coupled with the state government's orders restricting the activities of nonessential businesses, constitute an occurrence beyond the parties' reasonable control, allowing Phillips to end the

11

Stingel Agreement. The pandemic and government shutdown orders are the same type of events listed in the force majeure clause, which include, "without limitation," natural disaster, terrorist attack, and nuclear or chemical contamination. App'x at 60 ¶ 12(a). Each of the enumerated events are of a type that cause large-scale societal disruptions, are beyond the parties' control, and are not due to the parties' fault or negligence. By contrast, JN's argument would render meaningless both the catchall phrase and the force majeure clause's explicit statement that the non-exhaustive list of events following the catchall phrase did not limit it. *See* App'x at 60 ¶ 12(a). This would violate the principle of New York contract law that any interpretation "that has the effect of rendering at least one clause superfluous or meaningless . . . is not preferred and will be avoided if possible." *Galli v. Metz*, 973 F.2d 145, 149 (2d Cir. 1992) (internal quotation marks omitted).

This reading is consistent with the approach the New York Court of Appeals took in *Kel Kim*. Kel Kim operated a roller skating rink in leased premises. *Kel Kim*, 70 N.Y.2d at 901. The lease required Kel Kim to secure a certain amount of liability insurance. *Id.* Kel Kim maintained the necessary insurance for six years, but was unable to renew the policy, or obtain new

12

coverage, because of a crisis in the insurance business. *Id.* Kel Kim sued, seeking

a declaratory judgment to avoid eviction. *Id.* Kel Kim argued in relevant part that

its performance was excused by the force majeure provision in the lease

agreement, which provided:

> If either party to this Lease shall be delayed or prevented
> from the performance of any obligation through no fault
> of their own by reason of labor disputes, inability to
> procure materials, failure of utility service, restrictive
> governmental laws or regulations, riots, insurrection,
> war, adverse weather, Acts of God, or other similar
> causes beyond the control of such party, the performance
> of such obligation shall be excused for the period of the
> delay.

70 N.Y.2d at 902 n.*. The New York Court of Appeals determined that the force

majeure provision did not apply because the event that prevented Kel Kim's

performance under the contract was neither specifically included in the force

majeure provision nor generally included within the provision's catchall phrase,

"or other similar causes beyond the control of such party." *Id.* at 902-03. The

court explained that the event (the inability of Kel Kim to procure and maintain

liability insurance) was of a different kind and nature from the particular events

listed in the force majeure provision, such that it could not be considered a

"similar cause." *Id.* at 903. The events listed "pertain to a party's ability to

13

conduct day-to-day commercial operations on the premises," and the Court of Appeals rejected Kel Kim's argument that "a failure to procure and maintain insurance" fell within those parameters. *Id.* Rather, the court held, "the requirement that specified amounts of public liability insurance at all times be maintained goes not to frustrated expectations in day-to-day commercial operations on the premises—such as interruptions in the availability of labor, materials and utility services—but to the bargained-for protection of the landlord's unrelated economic interests where the tenant chooses to continue operating a public roller skating rink on the premises." *Id.*

In contrast, here the COVID-19 pandemic and government shutdown orders are exactly the sort of events that fall within the force majeure clause as events "beyond [the] reasonable control" of either party, App'x at 60 ¶ 12(a), and likewise qualify as events that "frustrate[] expectations" as to how business operates, *see Kel Kim*, 70 N.Y.2d at 903.

**II.    Consent**

JN also argues that Phillips was in breach of the Stingel Agreement before it terminated because it "fail[ed] to obtain JN's prior written consent to reschedule" the New York Auction. Appellant's Br. at 10. JN notes that Phillips

postponed the New York Auction on March 14—before the order prohibiting gatherings of 50 or more people issued on March 16. Because it predated the March 16 order, JN argues, Phillips' decision to postpone was discretionary, and required JN's consent. We disagree. The decision to postpone was dictated by the pandemic and executive orders issued in response to the pandemic, and thus fell within the force majeure clause. *See, e.g.*, *Melendez v. City of New York,* 16 F.4th 992, 997 (2d Cir. 2021) ("... New York State was hit early and hard by the pandemic. By the end of March 2020, the state had become the nation's pandemic epicenter, reporting approximately one third of infection cases nationwide, with New York City alone then accounting for one quarter of the country's virus-related deaths."). As explained in *Melendez*:

> In an effort to control the pandemic within New York, the state legislature, on March 3, 2020, granted then-Governor Andrew M. Cuomo broad authority to "issue any directive during a state disaster emergency" that he deemed "necessary to cope with the disaster," and expanded his existing authority temporarily to suspend "any statute, local law, ordinance, or orders, rules or regulations." Four days later, the Governor declared the COVID-19 pandemic a state disaster emergency, and proceeded, over the next weeks and months, to issue more than seventy executive orders to address the crisis.

*Id.* at 998-99 (citations omitted).

Nor are we troubled that Phillips's decision to postpone preceded the particular executive order closing nonessential businesses by two days. From March 7 onward the governor issued a series of executive orders imposing restrictions on nonessential businesses and gatherings that became stricter as time went on, and were repeatedly extended. *See*, *e.g.*, 9 NYCRR 8.202.3, 8.202.14, 8.202.18, and 8.202.31; *see also Melendez*, 16 F.4th at 999 ("Certain orders issued between March 16 and 19, 2020, closed or severely limited the in-person operation of large numbers of New York businesses. These shut-down orders were repeatedly extended and modified over the following months." (citations omitted)). Thus, even assuming arguendo that the March 14 postponement was discretionary, by March 16 it would have been illegal for Phillips to hold the New York Auction. There was every indication that the restrictions would remain in effect for the foreseeable future, and indeed, the orders were still in effect during May 2020. As Phillips was barred by executive order from conducting the auction as called for in the agreement two days after its allegedly discretionary decision to postpone, any harm resulting from the alleged breach was de minimis and cannot support a claim for breach of contract. *See generally Restoration Realty Corp. v. Robero*, 58 N.Y.2d 1089, 1091 (1983) (rejecting

allegations of breach of contract where "the allegations are *de minimis* in nature and the plaintiff has failed to show any prejudice resulting from the . . . alleged breach"); *Milan Music, Inc. v. Emmel Commc'ns Booking, Inc.*, 829 N.Y.S.2d 485 (1st Dep't 2007) ("Without a clear demonstration of damages, there can be no claim for breach of contract.").

Finally, we conclude, as the district court did, that JN fails to raise a question of material fact on the issue of whether Phillips's decision to invoke the force majeure clause was pretextual. *JN Contemporary*, 507 F. Supp. 3d at 504. As the district court aptly held, because Phillips properly "exercise[d] its contractual right to terminate the Stingel Agreement, its motives for doing so are irrelevant." *Id.*; *see also Big Apple Car, Inc. v. City of New York*, 611 N.Y.S.2d 533, 534 (1st Dep't 1994) (holding that where party terminates contract "in accordance with the express provisions of" a termination clause, no "court inquiry into whether the termination was activated by an ulterior motive" is merited).

**III.    The Basquiat Agreement**

JN also argues that the district court erred in dismissing its claim for breach of the Basquiat Agreement because that agreement operated in tandem with the Stingel Agreement: JN guaranteed the sale of the Basquiat Painting

17

while Phillips guaranteed the sale of the Stingel Agreement. By breaching the Stingel Agreement, JN argues, Phillips also breached the Basquiat Agreement.

In relevant part, the Basquiat Agreement states:

> Conditional upon signature by you of the Consignment Agreement with Guarantee of Minimum Price in respect of the work by Rudolph Stingel, *Untitled, 2009* . . . and conditional upon the above mentioned Property being offered for sale with a commitment by Phillips to pay the Seller a Guaranteed Minimum you have agreed that you will provide a third-party guarantee obligation ('Guarantee Obligation') as follows . . . .

App'x at 50. Both agreements contained integration clauses.

"Whether the parties intended to treat both agreements as mutually dependent contracts, the breach of one undoing the obligations under the other, is a question of fact. In determining whether contracts are separable or entire, the primary standard is the intent manifested, viewed in the surrounding circumstances." *Rudman v. Cowles Commc'ns*, 30 N.Y.2d 1, 13 (1972). "Under New York law, the fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent." *Eternity Glob. Master Fund*, 375 F.3d at 177 (internal quotation marks and brackets omitted).

The plain language of the Basquiat Agreement makes clear that under that agreement, Phillips was obligated only to sell the Basquiat Painting and JN was

18

required only to enter into the Stingel Agreement. The Basquiat Agreement was fully performed: JN signed the Stingel Agreement, and Phillips auctioned off the Basquiat Painting and paid the seller a guaranteed sum. The Basquiat Agreement is completely silent as to any obligation Phillips had pursuant to the Stingel Agreement. If the parties intended to enter into a "trade," as JN argues, that is not reflected in the agreements' unambiguous language. As "there was no language of condition" making the full performance of the Stingel Agreement part of the performance of the Basquiat Agreement, the district court properly dismissed the claim as a matter of law. *Schron v. Troutman Saunders LLP*, 945 N.Y.S.2d 25, 29 (1st Dep't 2012). The only link between the two was the obligation of JN to enter into the Stingel Agreement. *See, e.g., Rudman*, 30 N.Y.2d at 13 ("[W]hen two parties have made two separate contracts it is more likely that promises made in one are not conditional on performances required by the other.") (internal quotation marks omitted)). If the parties wished to condition performance of one agreement on the performance of the other, the agreements could have been so drafted. *Compare Applehead Pictures LLC v. Perelman*, 913 N.Y.S.2d 165, 189 (1st Dep't 2010) ("Manifestly, one agreement may follow from and even have as its *raison d'etre* another and yet be independently enforceable."

(internal quotation marks omitted)), *with Movado Grp., Inc. v. Mozaffarian*, 938 N.Y.S.2d 27, 28 (1st Dep't 2012) ("[T]he terms and conditions of the extrinsic document were incorporated into the credit agreement, and [] defendants[] acknowledged receipt and agreed to be bound by the same. The credit agreement, which identified the terms and conditions as those contained on each invoice, was sufficient to put defendants on notice that there was an additional document of legal import to the contract they were executing.").

Moreover, each agreement contained an integration clause—further evidence drawn from the agreements' four corners that the two are not interdependent. And the integration clauses "bar the use of parol evidence of the parties' intent and of any other agreements or understandings." *Schron*, 945 N.Y.S.2d at 29; *see also id.* ("[Where] there was absolutely no language of condition making the funding of the loan an express condition precedent to the right to exercise the $100 million option . . . the parol evidence rule precluded the use of extrinsic evidence to show the claimed interdependence."). Finally, even assuming the Basquiat Agreement required Phillips to fully perform the Stingel Agreement, Phillips' proper invocation of the force majeure clause excused its performance.

## IV. Remaining Issues

JN also challenges the district court's dismissal of its implied covenant claim. Under New York law, "implicit in every contract is a covenant of good faith and fair dealing . . . which encompasses any promises that a reasonable promisee would understand to be included." *Spinelli v. Nat'l Football League*, 903 F.3d 185, 205 (2d Cir. 2018) (internal quotation marks omitted). The implied covenant of good faith and fair dealing includes a promise that "neither party to a contract shall do anything that has the effect of destroying or injuring the right of the other party to receive the fruits of the contract, or to violate the party's presumed intentions or reasonable expectations." *Id.* (internal quotation marks and brackets omitted). A claim for violation of the covenant survives a motion to dismiss only if it is based on allegations different from those underlying the breach of contract claim, and the relief sought is not intrinsically tied to the damages that flow from the breach of contract. *See Harris v. Provident Life & Accident Ins. Co.*, 310 F.3d 73, 80 (2d Cir. 2002) (applying New York law). The district court correctly dismissed this claim as duplicative. Even

accepting JN's arguments that it set out a different factual basis for this claim than the factual basis set out in its breach of contract claim, the damages sought for both claims would be the same: compensation for the lost sale.

Nor are we persuaded that the district court erred in dismissing JN's claims that Phillips acted in bad faith. JN argues that its implied covenant claim took in "the full context of Phillips' bad faith actions surrounding its unlawful termination decision." Appellant's Br. at 48. At bottom, regardless of whether it was pretextual or not, Phillips exercised its negotiated right to terminate under the force majeure clause. *See* 23 *Williston on Contracts* § 63:22 (4th ed. 2021) ("[T]here can be no breach of the implied promise or covenant of good faith and fair dealing where the contract expressly permits the actions being challenged, and the defendant acts in accordance with the express terms of the contract.").

Finally, JN argues that it properly stated a claim for breach of fiduciary duty based on the theory that Phillips owed JN a duty of loyalty by virtue of the consignment arrangement. Like the claim for breach of the implied covenant, the breach of fiduciary duty claim fails as a matter of law because Phillips properly terminated the contract. *See Marc Jancou Fine Art Ltd. v. Sotheby's Inc.*, 967 N.Y.S.2d 649 (1st Dep't 2013) ("The consignment agreement between plaintiff

and Sotheby's permitted Sotheby's to withdraw the artwork owned by plaintiff from auction if Sotheby's had any doubt, in its sole judgment, as to the work's 'attribution,'" such that Sotheby's acted within its rights in withdrawing the art from auction when the artist claimed her reputation would be harmed if the work were offered for auction after being restored.).

## CONCLUSION

For the reasons given above, the judgment is affirmed.