RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 24a0150p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

AVANTAX WEALTH MANAGEMENT, INC.,

          *Plaintiff-Appellee*,

   *v.*

MARRIOTT HOTEL SERVICES, INC.,

          *Defendant-Appellant*.

No. 23-5880

─────────────

Appeal from the United States District Court for the Middle District of Tennessee at Nashville.
No. 3:21-cv-00810—William Lynn Campbell, Jr., District Judge.

Argued: May 2, 2024

Decided and Filed: July 12, 2024

Before: SILER, CLAY, and GRIFFIN, Circuit Judges.

─────────────

## COUNSEL

─────────────

**ARGUED:** Steven M. Rudner, RUDNER LAW OFFICES, Dallas, Texas, for Appellant. J. Isaac Sanders, NEAL & HARWELL PLC, Nashville, Tennessee, for Appellee. **ON BRIEF:** Steven M. Rudner, RUDNER LAW OFFICES, Dallas, Texas, for Appellant. J. Isaac Sanders, Jeffrey A. Zager, William J. Harbison II, NEAL & HARWELL PLC, Nashville, Tennessee, for Appellee.

─────────────

## OPINION

─────────────

CLAY, Circuit Judge. Defendant Marriott Hotel Services, Inc. ("Marriott") appeals the denial of its motion for summary judgment and the grant of summary judgment to Plaintiff Avantax Wealth Management, Inc. ("Avantax"). After terminating a contract with a hotel

managed by Marriott, Avantax brought the instant declaratory judgment action against Marriott, seeking a declaration approving its termination of the contract. Marriott thereafter filed a counterclaim for breach of contract, and both parties moved for summary judgment. The district court granted Avantax's motion for summary judgment and denied Marriott's motion for summary judgment because it concluded that Avantax validly terminated the contract under the contract's force majeure clause. For the reasons set forth below, we **AFFIRM** the district court's order.

## I. BACKGROUND

### A. The Parties' Agreement

For a number of years, Plaintiff Avantax, a financial planning company, and its predecessor companies have held an annual conference for company employees. The purpose of the annual conference is to promote the continuing education of the company's employees and to encourage networking and communication among attendees. The conference has frequently been described as a "family reunion," as many of the attending employees know each other from having gotten together in prior years. *See* Guess Dep. Excerpts, R. 53-2, Page ID #843, 847.

The conference has followed a similar schedule year after year. Over several days, employees attend daily general sessions at which speakers present, breakfasts and lunches, networking opportunities, a hall of exhibit booths, and a closing party. The conference has normally also included an opening reception, with food service and an open bar, which has been designed to encourage people to move about, interact, and socialize.

Avantax's 2021 annual conference was to be held at the Gaylord Opryland Resort & Convention Center ("Gaylord Opryland") in Nashville, Tennessee. In March 2019, Avantax's predecessor, H.D. Vest, Inc., entered into a contract with the Gaylord Opryland to host the 2021 annual conference from June 18–24, 2021. Reflecting the conference's usual schedule, the contract for the 2021 conference provided for daily general sessions for an expected 1,200 attendees, as well as an opening reception for an expected 1,200 attendees, each to be held in a single event space. The contract also included placeholder slots for meals and a hall of exhibit booths. Based on these events and the planned attendance, the contract committed Avantax to

spend a minimum of $575,000 on food and beverages and to use a minimum of 80% of 3,699 hotel guest room nights, or to pay the difference between each minimum and Avantax's actual spending in liquidated damages.

In addition to these provisions, the contract contained a clause, titled "Force Majeure," which stated as follows:

> Either party may be excused from performance without liability if circumstances beyond its reasonable control, such as acts of God, war, acts of domestic terrorism, strikes or similar circumstances, make it illegal or impossible to provide or use the Hotel facilities. The ability to terminate pursuant to this clause is conditioned upon deliver[ing] written notice to the other party setting forth the basis for such termination within ten (10) days after learning of such basis.

Agreement, R. 59-10, Page ID #1541.

Avantax's predecessor and the Gaylord Opryland executed this agreement on March 31, 2019.

## B. The COVID-19 Pandemic

Ten months later, on January 31, 2020, the United States Department of Health and Human Services declared a public health emergency due to the rapid global spread of COVID-19. The Metropolitan Board of Health of Nashville and Davidson County ("Metro Public Health Department") followed suit, declaring a public health emergency due to COVID-19 on March 15, 2020.

In the year that followed, the Metro Public Health Department issued a series of public health orders that restricted gatherings in Nashville and Davidson County in an effort to limit the spread of COVID-19. At this time, the Metro Public Health Department was also regulating the local hospitality industry directly by requiring hotels to seek Department approval to host events. While the Department initially approved events on a case-by-case basis, during the period relevant to this lawsuit, the Department shifted to categorizing events by risk level and approving an attendance cap based on an event's risk class.

On March 10, 2021, the Department issued a letter to local hospitality businesses about future gathering restrictions to help businesses "plan events months from now." March 10, 2021

Letter, R. 53-17, Page ID #1059. The March 10 letter stated that the Department could "forecast with reasonable confidence that [the county] w[ould] reach 40 percent vaccination by July 1" and that it anticipated reaching "the 30 percent level in April or early May." *Id.* The letter noted that at a 40 percent vaccination level, gathering restrictions would be somewhat relaxed, such that the Department expected there would be a cap of 300 attendees for very high risk events, 750 attendees for high risk events, 1,250 attendees for low risk events, and 5,000 attendees for very low risk events. The Gaylord Opryland forwarded this letter to Avantax on March 15, 2021.

On March 24, 2021, the Metro Public Health Department promulgated Public Health Order 13. Building on prior public health orders, Order 13 set forth restrictions for a third phase of reopening Nashville and Davidson County. Shortly thereafter, the Metro Public Health Department issued an individualized package of information to the Gaylord Opryland regarding Order 13, containing tailored restrictions on the Gaylord Opryland's events. The individualized information package required the Gaylord Opryland to comply with a cap of 175 attendees for very high risk events, 450 attendees for high risk events, 750 attendees for low risk events, and 2,000 attendees for very low risk events.

## C. Termination of the Agreement

In early March 2021, Avantax and the Gaylord Opryland were negotiating a potential addendum to their contract to account for COVID-19 restrictions. However, an addendum was never finalized. On March 25, 2021, Avantax sent a letter to the Gaylord Opryland terminating the parties' agreement pursuant to the agreement's force majeure clause. As its basis for invoking the force majeure clause, Avantax pointed to the Metro Public Health Department's March 10, 2021 letter, which Avantax had received on March 15, 2021. According to Avantax, the March 10 letter "indicate[d] that through July 1, 2021 very high risk gatherings (which includes celebratory functions such as the event contemplated by Avantax in the Agreement) w[ould] be limited to a cap of 300 people." Termination Letter, R. 53-23, Page ID #1106. Thus, Avantax stated that the Gaylord Opryland would be unable to "hold an event that will allow for a minimum of 1,200 attendees in June 2021, which is the minimum number of expected attendees" set forth in the agreement. *Id.*

On April 20, 2021, the Gaylord Opryland billed Avantax $1,326,206 for canceling the contract, reflecting 100% of the planned hotel room costs and 75% of the agreement's food and beverage minimum.  Avantax has not paid this sum.  On April 27, 2021, the Metro Public Health Department announced that "all pandemic restrictions and capacity limits w[ould] be dropped on May 14."  April 28, 2021 Email, R. 59-26, Page ID #1660.  It is undisputed that by June 2021, all local COVID-19 restrictions had been lifted.

### D.  Procedural History

On October 22, 2021, Avantax brought a declaratory judgment action against RHP Hotels, LLC and Ryman Hospitality Properties, Inc., d/b/a Gaylord Opryland, seeking a declaration that Avantax's termination of the parties' contract was proper and that the Gaylord Opryland was not entitled to any costs relating to termination.  On December 21, 2021, the parties substituted Marriott as the defendant in place of RHP Hotels, LLC and Ryman Hospitality Properties, Inc.  Marriott then filed a counterclaim against Avantax for breach of contract, for which it sought liquidated damages in the amount of $1,326,206, or in the alternative, lost profits.

Subsequently, both parties moved for summary judgment.  At the summary judgment stage, Avantax argued that it had validly terminated the parties' contract under the force majeure clause, that its non-performance of the contract was excused because the contract's purpose had been frustrated, and that a number of additional grounds precluded a grant of summary judgment to Marriott.  Marriott argued that Avantax had not validly terminated the contract, that Avantax's non-performance was not excused, and that Avantax had therefore breached the parties' agreement.

On September 26, 2023, the district court granted Avantax's motion for summary judgment and denied Marriott's motion for summary judgment on the grounds that Avantax had properly terminated the parties' contract under the force majeure clause.  Having resolved the summary judgment motions on this basis, the district court declined to reach the other issues

presented by the summary judgment briefing.[1]   The district court then entered judgment for Avantax, from which Marriott timely appealed.

## II.  DISCUSSION

### A.  Standard of Review

We review a district court's grant or denial of a motion for summary judgment *de novo*. *Premo v. United States*, 599 F.3d 540, 544 (6th Cir. 2010).  Summary judgment is proper when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "In resolving a summary judgment motion, this court must view the evidence in the light most favorable to" the non-moving party.  *Huckaby v. Priest*, 636 F.3d 211, 216 (6th Cir. 2011).  "We review cross motions for summary judgment under this standard as well, evaluating each motion on its own merits."  *La Quinta Corp. v. Heartland Props. LLC*, 603 F.3d 327, 335 (6th Cir. 2010).

A breach of contract claim is a state law claim, which the parties agree is governed by Tennessee law.  When this Court's jurisdiction is based on diversity of citizenship and it is deciding an issue of state law, the Court must "anticipate how the relevant state's highest court would rule in the case and [is] bound by controlling decisions of that court."  *See Bear Stearns Gov't Secs., Inc. v. Dow Corning Corp.* (*In re Dow Corning Corp.*), 419 F.3d 543, 549 (6th Cir. 2005).  "Intermediate state appellate courts' decisions are also viewed as persuasive unless it is shown that the state's highest court would decide the issue differently."  *Id.*

### B.  Analysis

The central issue on appeal is whether Avantax validly terminated its contract with Marriott under the contract's force majeure clause.  A force majeure clause is a contractual

---

[1]In addition to the motions for summary judgment, Avantax's motion for sanctions against Marriott due to spoliation of evidence was also before the district court.  The motion for sanctions, which the district court granted in part and denied in part as moot, is not before us on appeal.  On appeal, Marriott states only that it "denies that any spoliation of evidence occurred, and clearly the District Court was able to deny the motion as moot because it found no issue of fact in dispute that would be affected by any adverse inference, on any issue affecting judgment as a matter of law."  Appellant's Reply Br. at 25.  These cursory statements are not enough to preserve this issue.  *See United States v. Huntington Nat'l Bank*, 574 F.3d 329, 332 (6th Cir. 2009).

provision that typically excuses performance due to an extraordinary and unforeseeable event. *See JN Contemp. Art LLC v. Phillips Auctioneers LLC*, 29 F.4th 118, 123 (2d Cir. 2022). Courts interpret force majeure clauses as written in order to give meaning to the parties' bargained-for terms. *Wis. Elec. Power Co. v. Union Pac. R.R. Co.*, 557 F.3d 504, 507 (7th Cir. 2009). Nonetheless, courts may turn to the more general force majeure doctrine to fill in any blanks left by a contract's language. *See United States v. Bridgewater*, 995 F.3d 591, 596 n.3 (7th Cir. 2021).

Marriott and Avantax's force majeure clause permitted either party to terminate their contract "without liability if circumstances beyond [the party's] reasonable control, such as acts of God, war, acts of domestic terrorism, strikes or similar circumstances, make it illegal or impossible to provide or use the Hotel facilities." Agreement, R. 59-10, Page ID #1541. Marriott argues that Avantax's reliance on this force majeure clause to terminate the contract was erroneous for three reasons. First, Marriott argues that the Gaylord Opryland was not "illegal or impossible to provide or use" because it was usable in some way at all relevant times, even if not in the way the parties contracted. In any case, Marriott argues that it was legal and possible to use the Gaylord Opryland in the manner contracted. Finally, Marriott argues that Avantax did not comply with a notice provision of the parties' force majeure clause.

**1.**

In support of its first argument, that the Gaylord Opryland was available in some way at all relevant times, Marriott points to the part of the force majeure clause that reads: "Either party may be excused from performance without liability if circumstances beyond its reasonable control . . . make it illegal or impossible to provide or use the Hotel facilities." *Id.* Marriott argues that because this sentence states unqualifiedly that it must be "illegal or impossible to provide or use the Hotel facilities," the force majeure clause applies only if the Gaylord Opryland could not have been used in any fashion at all. Avantax responds that the force majeure clause's reference to providing or using the facilities is best understood to mean that the clause applies if the parties could not have used the Gaylord Opryland in the manner specified by the contract.

Contractual interpretation turns on the intent of the parties, and that intent is presumptively expressed "in the body of the contract." *Planters Gin Co. v. Fed. Compress & Warehouse Co.*, 78 S.W.3d 885, 890 (Tenn. 2002). Our task is to give the body of the contract meaning as a whole, and we therefore "cannot read portions of a contract in isolation." *Maggart v. Almany Realtors, Inc.*, 259 S.W.3d 700, 705 (Tenn. 2008). We must also avoid "rendering portions of [the contract] neutralized or without effect," because the parties presumptively intended for all parts of their contract to have meaning. *See id.* at 704.

Reading the contract as a whole supports Avantax's interpretation—that the force majeure clause allowed for termination of the contract when the Gaylord Opryland could not be used as contractually intended. The parties' force majeure clause came after pages of terms painstakingly laying out the planned uses of the Gaylord Opryland's facilities and the conditions that both parties had to deliver, including the expected rooms and room setup to be used for Avantax's events, the minimum hotel room block for which Avantax was accountable, and a food and beverage minimum that Avantax had to meet. The force majeure clause's reference to providing and using the Gaylord Opryland would therefore be best understood to mean the provision and use of the facilities that the parties had just spent pages setting forth.

Marriott's interpretation, on the other hand, neutralizes the parties' force majeure clause. *See id.* Short of the complete closure or destruction of the Gaylord Opryland, a force majeure event would never justify termination under Marriott's reading of the contract. Applying Marriott's interpretation, the availability of just one hotel room or use of the hotel by a single Avantax employee would save the contract from termination, even if far afield from the performance envisioned by the contract. Such a reading would essentially write the force majeure clause out of existence, making it highly disfavored. *See id.* (cautioning that courts should avoid neutralizing parts of a contract).

The purpose of the force majeure doctrine also unequivocally supports Avantax's position. Ordinarily, the force majeure doctrine applies when an unforeseeable and extraordinary event prevents performance of a contract. *Phillips Auctioneers LLC*, 29 F.4th at 123. Impossibility or illegality of performance, therefore, is what allows for termination under the general force majeure doctrine. *See id.* That is identical to the reading of the contract put forth

by Avantax, which focuses on the impossibility and illegality of performance, and contrary to Marriot's interpretation, which focuses on the impossibility and illegality of using the Gaylord Opryland in any fashion.

According to Marriott, Avantax's interpretation would permit any technical or minor departure from the contract to serve as grounds for termination under the force majeure clause. But multiple parts of the parties' contract render that untrue. The force majeure clause itself requires the existence of an extraordinary event beyond the control of the parties, akin to "acts of God, war," or "domestic terrorism"—a formidable barrier to terminating the contract. Agreement, R. 59-10, Page ID #1541. And the parties do not dispute that COVID-19 restrictions can qualify as such an event. Marriott also bargained for considerable flexibility in how to perform. One contractual provision reads, for example, "Specific meeting rooms cannot be guaranteed and are subject to change" and Marriott "reserve[s] the right to adjust the assignment of the Group's meeting and function space to a size appropriate for the number of expected attendees." *Id.* at Page ID #1534. Marriott clearly anticipated, and contracted around, the problem of minor departures. A force majeure event that had only minor effects on the Gaylord Opryland's facilities would therefore not impact the parties' ability "to provide or use the Hotel facilities" as contracted, making Marriott's argument on this point unavailing. *See id.* at Page ID #1541.[2]

**2.**

We therefore consider whether it was illegal or impossible to use or provide the Gaylord Opryland in the manner set forth by the contract. According to Marriott, that determination should be made in hindsight as of the date performance was due. It is undisputed that by June 18–24, 2021, when performance was due, it ultimately would have been legal and possible for

---

[2]Marriott also argues that Avantax's reading of the contract renders meaningless a contractual provision, titled "Attrition," that penalizes Avantax for using up less than eighty percent of its reserved hotel guest room block. This provision, according to Marriott, reveals that the parties "*explicitly contemplated*" an event "with less than one hundred percent" attendance. Appellant's Br. at 30. But the attrition clause in no way conflicts with the force majeure clause. If the contract had not been terminated and Avantax's hotel room usage had fallen below eighty percent, Avantax would have owed Marriott liquidated damages. Marriott, in exchange for the inclusion of liquidated damages in the contract, was required to accommodate an expected 1,200 individuals. If either party could show under the contract that a force majeure event made performance illegal or impossible, that party could terminate the contract.

Marriott to host Avantax's event because all local COVID-19 restrictions and capacity limits had been lifted.  On the other hand, Avantax argues that the proper question is whether when it terminated the contract, a conference in June would have been illegal or impossible.

We conclude that the proper inquiry is whether Avantax had valid grounds to invoke the force majeure clause at the time it terminated the contract.  The language of the force majeure clause supports this conclusion.  The clause's notice provision required a prospective determination of illegality and impossibility.  It mandated written notice of termination "within ten (10) days after learning" of "the basis for such termination."  Agreement, R. 59-10, Page ID #1541.  Avantax was therefore required to terminate the contract not only in advance of performance, but within ten days of determining, prospectively, that its June conference could not go forward.  Marriott's hindsight interpretation would put a party in the untenable position of having to terminate a contract possibly well in advance of performance, if it learned of the basis for termination then, only to have its liability for terminating the contract judged long after in hindsight.

We also observe that the parties' force majeure clause refers to events that "make," rather than "made" (in hindsight) performance illegal or impossible.  And while a contract's use of present tense may cover events occurring in the future, it "usually does not refer to the past," further supporting a forward-looking inquiry.  *See Russell v. Citigroup, Inc.*, 748 F.3d 677, 679 (6th Cir. 2014).  The clause's language favors evaluating illegality and impossibility in light of the facts available at the time of termination.  Had Marriott wanted a backward-looking force majeure clause, it could have bargained for the clause to be written in such a manner.

The few cases to have dealt with this issue, which the parties and district court refer to as the "measuring date" of the force majeure clause, have largely endorsed looking to the time of termination.  In *Nelkin v. Wedding Barn at Lakota's Farm, LLC*, the plaintiffs terminated their venue rental for an October 2020 wedding in May 2020, citing COVID-19 restrictions. 72 Misc.3d 1086, 1087 (N.Y. City Civ. Ct. 2020).  Adopting a similar interpretation to what Avantax proposes in this case, the *Nelkin* court stated that "[t]he issue before the court is whether the plaintiffs had sufficient grounds to exercise the force majeure provision in May of 2020 based upon the circumstances present *at that time*, not how those circumstances may have

changed by October 10, 2020." *See id.* at 1094. "To determine otherwise," the court concluded, "would place an inequitable burden upon contracting parties, whereby they could never exercise force majeure provisions, regardless of the present circumstance, without being potentially contractually bound later." *Id.* at 1095.

The Second Circuit has endorsed comparable reasoning. In *JN Contemporary Art LLC v. Phillips Auctioneers LLC*, after a defendant-auctioneer postponed a May 2020 auction in March of that same year, it invoked a force majeure clause to terminate its agreement to auction off the plaintiff's artwork. 29 F.4th at 122. The Second Circuit concluded that the defendant had validly postponed the auction in March. *Id.* at 124–25. Taking a forward-looking view, the court noted that at the time of termination, "there was every indication that the [then-operative COVID-19] restrictions would remain in effect for the foreseeable future," including through the time of the auction. *See id.* at 126.

Marriott points to *Insight Global, LLC v. Marriott International, Inc.*, in which the Georgia Business Court favored measuring impossibility from when performance was due, rather than from the time of termination. No. 21-GSBC-0017, 2022 WL 2965497, at *17–18 (Ga. Bus. Ct. June 8, 2022). In support, the *Insight Global* court observed that the COVID-19 restrictions the plaintiff invoked to terminate the contract had been unlikely to last through the time of performance. *Id.* at *17. Yet that reasoning mixes one inquiry with another: whether there were reasonable grounds to invoke the force majeure clause at the time of termination with whether to measure illegality and impossibility from the time of termination at all. The *Insight Global* court then considered in detail exactly that first question—whether, at the time of termination, the restrictions in that case made it illegal or impossible to perform. *See id.* at *17–18. We are unconvinced that *Insight Global*, which is not binding on this Court in any case, stands for the proposition that a force majeure clause must be measured from the date of performance.

Lastly, we are mindful of the concerning incentives that Marriott's hindsight approach could create. It could encourage parties to delay a contract's termination as much as possible on the off chance that the force majeure impediment is cured. Where there is persuasive evidence that a force majeure event will prevent performance, an earlier termination benefits both parties. It better allows the parties to find substitute performance and to make alternative arrangements.

Absent clearer contractual language to the contrary, we reject Marriott's proposed approach of measuring illegality and impossibility in hindsight.

**3.**

In light of the above, the proper question is whether performance would have been illegal or impossible given the facts available on the date of termination: March 25, 2021. When Avantax terminated the contract on March 25, there had to be reasonable grounds to conclude its June conference would be illegal or impossible. *See Minor v. Minor*, 863 S.W.2d 51, 54 (Tenn. Ct. App. 1993) ("A qualifying word which must be read into every contract is the word 'reasonable,' or its equivalent 'reasonably'" (citation omitted)). Suffice to say, a "mere possibility," however remote, or an "unsupported conclusion" that Avantax's June conference could not go forward would be insufficient. *See Perlman v. Pioneer Ltd. P'ship,* 918 F.2d 1244, 1249 (5th Cir. 1990). Avantax clears that bar. Based on forward-looking guidance from the Metro Public Health Department, when viewed alongside then-current restrictions, Avantax reasonably concluded that the contracted-for uses of the Gaylord Opryland would be illegal and impossible.

We start with the then-current restrictions. When Avantax terminated the contract, the most recent local public health order was Order 13, promulgated on March 24, 2021, and effective on March 26, 2021. Order 13's event caps would have prevented Avantax's 1,200-person conference events from moving forward. They capped the Gaylord Opryland's events at 175 attendees for very high risk events, 450 attendees for high risk events, 750 attendees for low risk events, and 2,000 attendees for very low risk events. As Marriott concedes, a number of Avantax's major conference functions fell into the first three categories. By illustration, Order 13 would have required dividing a single daily general session into two separate sessions, moving meals into four event spaces rather than two, and splitting up Avantax's opening reception into seven separate events. This certainly would have prevented the contract from being executed as intended.

Moreover, Avantax was not acting only or even primarily upon the then-current state of affairs. Rather its termination letter pointed to the March 10, 2021 guidance issued by the Metro

Public Health Department to the hotel industry about future COVID-19 restrictions. The guidance stated that the Department could "forecast with reasonable confidence that [the county] w[ould] reach 40 percent vaccination by July 1," and that a 40 percent vaccination rate would permit very high risk events for up to 300 attendees, high risk events for up to 750 attendees, low risk events for up to 1,250 attendees, and very low risk events for up to 5,000 attendees. March 10, 2021 Letter, R. 53-17, Page ID #1059.

Even these loosened COVID-19 restrictions would not allow for the conference to go forward as contracted. To begin, the guidance forecasted July 1 as the date triggering loosened restrictions, a week after Avantax's conference. Even assuming restrictions loosened by June 18–24, Avantax's conference would have still required reconfiguration that was at odds with the contract. The loosened restrictions would have mandated, for example, the opening reception of the conference to be turned into four separate, siloed events. And the opening reception was no small part of the contract. Although it was a single event, it was a very significant aspect of how Avantax was to meet its contractually required $575,000 food and beverage minimum and was a primary social event of the conference. *See* Agreement, R. 59-10, Page ID #1537–38 (stating that "the food and beverage functions listed on the schedule of events are a major component of this Agreement").

Marriott argues that the contract permitted it to make adjustments to Avantax's conference. But nothing in the parties' agreement gave Marriott the authority to fundamentally restructure the conference events. Marriott points to the provision of the parties' agreement that states that "[s]pecific meeting rooms cannot be guaranteed," and that Marriott "reserve[d] the right to adjust the assignment of the Group's meeting and function space to a size appropriate for the number of expected attendees at each function." *Id.* at Page ID #1534. Yet, by those very terms, Marriott reserved the right to reassign the function space only based on the expected number of attendees, not based on the need to split up that total number of attendees. Likewise, the disclaimer against the guarantee of specific meeting rooms did not give Marriott the authority to, for example, turn a single function into seven separate events. Read most naturally, it gave Marriott the authority to swap out one conference room for a materially similar conference room.

Any modifications to Avantax's conference would have extended far beyond such routine adjustments.

Marriott adds that the parties' contract "is subject to all applicable federal, state, and local laws, including health and safety codes," and that this provision required the parties to modify the contract in any conceivable way to comply with the law. *Id.* at Page ID #1542. However, the fact that the contract was subject to all applicable laws did not mean that the parties were required to modify the contract in any possible way to render the contract legal. After all, the parties' force majeure clause permitted a party to terminate the contract based on illegality. The illegality ground of the force majeure clause would be obsolete if the parties were always required to modify the contract to comply with the law.

Finally, Marriott argues that Avantax terminated the contract based on uncertainty and speculation. It cites a number of cases disallowing termination on that basis. *See, e.g.*, *Perlman*, 918 F.2d at 1249 ("We require more than the mere possibility or unsupported conclusion of the existence" of a force majeure event.); *OWBR LLC v. Clear Channel Commc'ns, Inc.*, 266 F. Supp. 2d 1214, 1224 (D. Haw. 2003) ("To excuse a party's performance under a force majeure clause ad infinitum when an act of terrorism affects the American populace would render contracts meaningless in the present age, where terrorism could conceivably threaten our nation for the foreseeable future."); *Insight Glob.*, 2022 WL 2965497, at *17 (While "the pandemic has seemingly created a perpetual state of uncertainty, that uncertainty alone does not justify an assumption that regulations in place today will remain in place six months from now.").

Permitting parties to invoke force majeure clauses based on speculation would be a concerning result indeed. However, Avantax did not invoke the force majeure clause based on mere speculation, uncertainty, or even the then-applicable restrictions. As the district court pointed out, the March 10 letter from the Metro Public Health Department gave Avantax "reasonable certainty" that its conference could not be performed as contracted in June 2021. Mem. Op., R. 90, Page ID #2849; *see also Minor*, 863 S.W.2d at 54. In that letter, the Metro Public Health Department—the very agency tracking local vaccination levels and promulgating gathering restrictions—"anticipate[d]" a forty-percent vaccination level and the new COVID-19 restrictions "with reasonable confidence." March 10, 2021 Letter, R. 53-17, Page ID #1059.

The Department provided this guidance to help the hotel industry plan "events months from now" by "providing assurance" of the way in which restrictions would change. *Id.* Unlike the cases to which Marriott cites, Avantax neither assumed then-current restrictions would remain in effect until June, nor did it merely theorize that its June event was illegal or impossible. It relied on guidance from the very agency issuing gathering restrictions, provided with reasonable confidence, and which was specifically designed to assist with planning events like Avantax's that were several months away. Under the parties' force majeure clause, and given these circumstances, it was proper for Avantax to terminate the parties' contract on this basis.

**4.**

Lastly, Marriott argues that Avantax failed to comply with the force majeure clause's requirement to provide written notice of the basis for termination "within ten (10) days after learning of such basis." Agreement, R. 59-10, Page ID #1541. Marriott contends that, insofar as the basis for termination was the pandemic and the general existence of COVID-19 restrictions, that basis had existed since March 2020, more than ten days before Avantax terminated the contract. Alternatively, Marriott contends that if the basis for termination was the March 10, 2021 letter from the Metro Public Health Department, that letter was not a force majeure event.

We easily reject Marriott's first argument because Avantax's termination letter clearly identifies the March 10, 2021 letter as the basis for invoking the force majeure clause, not COVID-19 or gathering restrictions generally. Marriott's second contention—that the letter itself was not a force majeure event—misreads the parties' force majeure clause. The parties' contract did not require ten days' notice following a force majeure event, but instead required ten days' notice following "the basis for [a] termination" under the agreement. *Id.* And the "basis for [a] termination" under the force majeure clause was: (1) the existence of "circumstances beyond [the parties'] reasonable control" that (2) "make it illegal or impossible to provide or use the Hotel facilities." *Id.* Because the March 10 letter gave Avantax reasonable grounds to conclude its June 2021 conference was illegal or impossible based on pandemic restrictions that were beyond Avantax's control, it constituted a valid basis for terminating the contract. Avantax, which undisputedly received the March 10 letter on March 15, 2021 and gave notice of termination on March 25, 2021, properly provided ten days' notice.

## III.  CONCLUSION

Avantax had sufficient grounds to invoke the force majeure clause of the parties' contract on March 25, 2021.  It then provided proper notice to Marriott of those grounds in its letter terminating the parties' contract.  For those reasons, we **AFFIRM** the district court's grant of summary judgment to Avantax.